| From: | Operation Department [operations@sinotranship.com] |
|---|---|
| Sent: | 21 January 2015 13:36 |
| To: | Master of Great Prosperity FBB500 |
| Cc: | Account Department; Chartering Department; Operation Department |
| Subject: | 答复: CLEAN FIXTURE RECAPS FOR D/C OF MV GREAT PROSPERITY |

TO: Master of Great Prosperity

FM: SSML OPS

DD: 21-Jan-2015


Dear Capt. Yu,

Good day,


We are happy to inform Master for D/C of subject vessel with the said Charterers "Sinotrans(Bermuda)LTD for ABT 11 MONS TO ABT 13 MONS and please found the details of recap terms at below.


Master pleased to state clearly for the "DATE/TIME" for "DLSOP disport -Qingdao" in Departure report and meanwhile, please send your redelivery notice and delivery notice to Sinotrans Canada and us for the purpose of calculation of new hire period.


Kindly confirm safe receipt the below message for Master's full understanding by return with thanks.



Best regards,

Viki Gan


-----邮件原件-----
发件人: Wang Shuai
发送时间: 2015 年 1 月 21 日 11:49
收件人: Operation Department
抄送: Chartering Department; Yuen Chun Hong; Ji Jie (jijie@sinotrans-vcr.com); 'info@sinotrans-vcr.com'
主题: 转发: CLEAN FIXTURE RECAPS FOR D/C OF MV GREAT PROSPERITY



Pls be adv that we have fully fixed below 5 vessels to sinotrans Vancouver in direct continuation of current cp as per below recap.


Brgds

Wangshuai



-----邮件原件-----

发件人: Ji Jie [mailto:jijie@sinotrans-vcr.com]

发送时间: 2015 年 1 月 21 日 3:52

收件人: Wang Shuai

抄送: Chartering Department; info@sinotrans-vcr.com<mailto:info@sinotrans-vcr.com>

主题: RE: CLEAN FIXTURE RECAPS FOR D/C OF MV GREAT PROSPERITY


Dear Wang Shuai,


Thanks for below revised clean fixture recaps which Charterers found in order.


B. Regards,

Ji Jie

Sinotrans Canada Inc.

As Agent

Tel: +1 604 6851500

Mob: +1 604 6499206

Email: jijie@sinotrans-vcr.com<mailto:jijie@sinotrans-vcr.com>

- MV GREAT PROSPERITY

- A/C SINOTRANS (BERMUDA) LTD.

- IN DIRECT CONTINUATION FOR A PERIOD OF ABOUT 11-13 MONTHS ('ABOUT' MEANS 15 DAYS MORE OR LESS)

- COMMENCEMENT IS TO COUNT UPON DLOSP OF VSL'S PRESENT TRIP (I.E. O/A 20/JAN/2015

- HIRE USD xxx DIOT, PAYABLE EVERY 15 DAYS IN ADVANCE

- BUNKER CLAUSE:

DESPITE THE ACTUAL BUNKER ROB FIGURES, UPON COMPLETION OF CURRENT CHARTER PERIOD AND COMMENCEMENT OF NEW CHARTER PERIOD, OWNERS TO BUY BACK HSFO 940.179MTS  / LSFO 51.53MTS / HSDO 42.666MTS / NIL LSDO AT CP PRICES, AND TO SELL THE BUNKERS TO CHTRS AGAIN AT BELOW BUNKER SPECS AND PRICES:

HSFO: 991.709 MTS @ USD xxx PMT   ( 991.709 = 940.179 + 51.53, LSFO IS NO LONGER IN USE AND SHALL BE CONSIDERED AS HSFO  )

HSDO: 42.666 MTS @ USD xxx PMT

LSDO:   0 MTS @ USD xxx PMT

BOR TO BE ABT THE SAME QTTY AS BOD. BUNKER PRICES ON REDELY TO BE THE SAME AS LISTED ABOVE, EXCEPT THE PRICE FOR ULSFO AS PER FIRST BUNKER INVOICE FOR SUPPLYING SUCH ULSFO ON BOARD.

- REDLY RANGE: DLOSP 1SP WITHIN TRADING LIMITS WITHIN SINGAPORE/JAPAN RANGE, CHOP WITHIN SKAW/CAPE PASSERO RANGE

- OTHERWISE ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED AS PER CURRENT CP WITH LOGICAL AMENDMENT ONLY

END

B. Regards,

wangshuai

## SHIP'S PARTICULARS

| | | | | |
|---|---|---|---|---|
| Vessel's Name | : Great Prosperity | | Ex. Name | : NIL |
| Flag | : Hong Kong | | Call Sign | : V R Y T 7 |
| Official No. | : HK-1061 | | IMO No. | : 9187710 |
| Classification | : ABS | | Class No. | : 9937974 |
| Character | : +A1, BULK CARRIER, (E), +AMS, +ACCU | | | |
| Built (Yr/Yard) | : July 1999 / Sumitomo Heavy Industries, Ltd.. Yokosuka, Japan (Hull No.1242) | | | |

| | | | | | |
|---|---|---|---|---|---|
| Summer Draft | : 13.871 | M | TPC | : 65.40 | (about) |
| LOA/LBP | : 225.00/216.00 | M | Breadth (MLD) | : 32.26 M | |
| Light Condition | : 9,567 MT | | Depth   (MLD) | : 19.20 M | |

| | | Draft | | Freeboard | | Deadweight | |
|---|---|---|---|---|---|---|---|
| Summer | : | 13.871 | M | 5.367 | M | 73679 | Mt |
| Winter | : | 13.582 | M | 5.656 | M | 71788 | Mt |
| Tropical | : | 14.160 | M | 5.078 | M | 75569 | Mt |
| Tropical F.W. | : | 14.477 | M | 4.761 | M | 75525 | Mt |
| F.W. | : | 14.188 | M | 5.050 | M | 73671 | Mt. |

F.W. Allowance   :     317.00     mm

| | | | | |
|---|---|---|---|---|
| Light Ship Drafts | (M) | : | F/A 0.75 / 3.04 | Mean : 1.89 M |
| Heavy Ballast Drafts | (M) | : | F/A 7.50 / 8.42 | Mean : 7.96 M (about) |
| Normal Ballast Drafts | (M) | : | F/A 5.22 / 6.63 | Mean : 5.93 M (about) |

*(Basis on full bunker condition)*

| | | | | | |
|---|---|---|---|---|---|
| G.T. / N.T. | International | 38,426 | / | 24,724 | |
| | Panama | N.A. | / | 31,783.87 | |
| | Suez | 39,901 | / | 37,371 | |

Remarks : max Panama Canal transit DWT basis on max TFWD 12.04 m (39'06") abt 59,500 mt..

Cubic breakdown of Cargo Hold - *( Hatch coaming capacity is included)*

<u>(M3)</u>                    <u>(FT3)</u>

1

No.1          :       11,256.3              397513
No.2          :       12,817.1              452632
No.3          :       13,270.2              468633
No.4          :       12,118.9              427975
No.5          :       13,272.2              468703
No.6          :       12,799.5              452010
No.7          :       11,764.2              415449
-----------------------------------------------------------------------------------
Total         :       87,298.4              3082915


Hatch / Holds      :    7 / 7


Hatch Dimensions   / Hold Dimension : -
            Hatches ( L x B )          Hold Dimension (L x B)
No.1   :   16.29 x 13.36 M            23.4 x F/ 6.6 M
                                      A/20.8 M
No.2   :   16.29 x 15.03 M            20.6 x F/22.0 M
                                      A/23.4 M
No.3   :   16.29 x 15.03 M            21.4 x 23.4 M
No.4   :   16.29 x 15.03 M            19.8 x 23.4 M
No.5   :   16.29 x 15.03M             21.6 x 23.4 M
No.6   :   16.29 x 15.03M             20.6 x F/23.4 M
                                      A/22.0 M
No.7   :   16.29 x 15.03 M            20.6 x F/20.4 M
                                      A/10.0 M


Constant  *(excluding F.W.and Dead and Unpumpable Ballast Water)* :     500     Mt    *(about)*
Airdraft  *(normal ballast)*      :     15.78     M   *(about)*
(Bss No.1 H/Coaming to W/L)


Highest point from keel       :     48.60     M   *(about)*   *(Radar Mast)*


Cargo battern        :     Nil


Great Lakes fitted        :     Nil


Foam installed        :     E/R


2

Logger fitted                          :        Nil

Australian ladder fitted               :        Yes

Holds Ventilators                      :        Natural

<u>Speed and Fuel Consumption</u>

Service Speed          :     (Laden)      13.2      Kts *(about)*
                             (Ballast)     14.0      Kts (about)


At sea     -     (Ballast)     I.F.O.     : 31.00 Mt (about) ME+AE
                 (Laden)       I.F.O.     : 32.50 Mt (about) ME+AE

*(Remarks: 1. all main engine, Diesel Engines, Diesel-electric Engines and auxiliary boiler, while the vessel is*
*operating in the 'Regulated California Waters', with either marine gas oil (MGO), with a*
*maximum of 1.0 percent sulfur by weight, or marine diesel oil(MDO), with a maximum of 0.5*
*percent   sulfur by weight to be used. Furthermore, when vessel operating within the North*
*America ECA on or after August 1, 2012, the sulphur content of fuel oil used on board must not*
*exceed 1.0%   and must not exceed 0.1% on or after January 1 2015.*
*2.    abt 0.1mt of MDO will be used at sea per day*
*3. at sea additional IFO 2.5mt for each ballasting, deballasting or ballast water exchange.*
*4. Above Speed and Consumption are based on good weather condition and smooth sea maximum*
*Beaufort scale 4, Douglas sea state 3 with no adverse current and no negative influence swell on*
*even keel in still and deep water with clean bottom, sea buoy to sea buoy, excluding canals,*
*narrows, restricted waters and periods when speed is reduced due to charterers' order, reasons*
*of safety and poor visibility, etc.*
*5. Marine Fuel Oil Sulfur Requirements for Operating Area from A to F (IMO Marpol Annex VI,*
*EU Directive 2005/33/EC , North America and CARB Regulation as per attached table.)*

In port     -     I.F.O.:     1.5-2.0 Mt *(about)*(cargo work)
                  I.F.O.:     1.2-1.6 Mt *(about)*    ( idle )
*(Remarks: 1. about 1.5-2.0 Mt per day(cargo work) and/or about 1.2-1.6 Mt per day(idle) of Marine gas oil*
*(DMA); or Marine diesel oil (DMB) with SULFUR content at or below 0.5% to be used for Diesel*
*Engines and Diesel-electric Engines while vessel approaching and within the 'REGULATED*
*CALIFORNIA WATERS' in the USA.*
*2. abt 0.1mt   of MDO will be used in port per day.*
*3. Diesel Generator will burn M. D.O. at low load below 30%, starting & stopping condition.)*

3

4. *Marine Fuel Oil Sulfur Emission Control Requirements for Operating Area from A to F (IMO Marpol Annex VI, EU Directive 2005/33/EC, North America and CARB Regulation) as per attached table.)*

Boiler Consumption:  At sea  -  I.F.O.  :  Nil  Mt (about)
In port  -  I.F.O.  :  1.0-2.0 Mt (about)

*(Remarks: 1. all main engine, Diesel Engines, Diesel-electric Engines and auxiliary boiler, while the vessel is operating in the 'Regulated California Waters', with either marine gas oil (MGO), with a maximum of 1.0 percent sulfur by weight, or marine diesel oil(MDO), with a maximum of 0.5 percent sulfur by weight to be used.*

*2. M.D.O. will be used at cold start and stop condition of Boiler*

*3. Marine Fuel Oil Sulfur Requirements for Operating Area from A to F (IMO Marpol Annex VI, EU Directive 2005/33/EC, North America and CARB Regulation)   as per attached table.*

Fuel Viscosity  :  HFO up to 380 cst at 50 degrees C. (Spec. ISO-8217:2010 RMG-380)
(HFO supplied should be in compliance with Marpol 73/78 Annex VI,

*1. Marine Fuel Oil Sulfur Requirements for Operating Area from A to F (IMO Marpol Annex VI, EU Directive 2005/33/EC, North America and CARB Regulation)   as per attached table.*

*2.  Fuel Oil Tank No. 3(C) designated for Low Sulfur Fuel trading SECA, EU and North America ECA)*

MGO/MDO Spec.ISO-8217:2010 DMA; or DMB with Sulfur Content at or below 0.5%
MDO Spec. ISO-8217:2010 DMB/DMC

*(Remark: 1. Marine Fuel Oil Sulfur Requirements for Operating Area from A to F (IMO Marpol Annex VI, EU Directive 2005/33/EC, North America and CARB Regulation)   as per attached table.)*

Bunker tank capacity at 85% full -  I. F.O. :  1757 M3 (about) HSFO
LSIFO :  288 M3(about) LSFO of 1.0% or below sulfur content only

***(Remark: Fuel Oil Tank No. 3 (C) designated for Low Sulfur Fuel trading SECA, EU and North America ECA.)***

Normal M.D.O. :  104.5 M3 ( about )
LSMGO  :  89  M3 (about)

Ballast capacity  :  32,560 M3  *(Including No.4 Cargo Hold 12,137 M3)*

4

F/W    capacity             :    296    Mt

F/W Consumption       :    12    Mt    *(about)*

F/W evaporator capacity per day   :   18   Mt *(about)*

Main Engine Maker / Type      : Diesel United Sulzer / 7RTA48T

Main Engine M.C.R.       : 11,400    PS   / 114     RPM
              C.S.O.       : 10,260    PS   / 106     RPM

Generator Engine         :     3 sets

G/E    Maker / Type       :    Yanmar Diesel Engine Co. Ltd/6NI8L-UN

G/E output / vol / cycle      :    380 Kw / 450 V / 60 HZ

Special Survey due        :    31 July 2014    (latest)    ( Last done : Qingdao Beihai S/Y (Aug/09)

Drydocking due           :    July, 2014       (Last done: Feb.,2012 at Shanghai Huarun Dadong S/Y)

Owner's P&I Club          :    The Swedish Club

Hull Underwriters         :    Claims Lead – China Taiping

Value of H and M          :    USD 11.0    Million
I/V                       :    USD  3.0    Million
War Risk                  :    USD 14.0    Million

   *(Remarks:   1. Insured value of vessel's H&M, I/V, WAR RISK to be adjusted at owners' option at any*
   *time   of each year.*
       *2. Additional premium for vessel breaching IWL to be calculated on the basis of*
       *vessel's H&M and I/V insured value.*
       *3. Additional premium for vessel breaching WAR RISK WARRANTIES to be calculated*
       *on the basis of vessel's WAR RISK insured value.)*

Vessel's documents -

(a)   Current valid canals measurement Certificate   :

5

|              |     | G.T.    |   | N.T.      |
|--------------|-----|---------|---|-----------|
| Panama Canal | :   | -       | / | 31,783.87 |
| Suez Canal   | :   | 39,901  | / | 37,371    |

(b)  Cargo gear register and certificate in compliance with requirements of classification
Society   :

Class        :    ABS.

(c)  Tonnage Certificate   :        International Tonnage Certificate (1969)

(d)  U.S. Federal Maritime Commission Certificate of Financial Responsibility as required
under the U.S. Water Quality improvement Act of 1970 and later amendments: Yes

Hatches -

Manufacturers / Type      Hatch covers      : Nakata Mac Corp./Side Rolling Type

Deck Strength -

Main Deck                 :   4.31   T/M2
*(except between hatch ends)*

Hatch cover No.1          :   2.08   T/M2
        No.2-7            :   1.75   T/M2

Tank Top :-

For Homo. Load condition  :   Tank Top   No.1 to No.7   :   15.067    T/M2

For Alt. Load Condition   :   Tank Top   No.1           :   28.534    T/M2
                                        No.3 / 5 / 7   :   26.802    T/M2

Tank Top Ceiling          :      15.067    T/M2

Cranes                    :      Gearless

**Vessel Equipped Inmarsat Communication System (FBB ) & ( C ) :**

Inmarsat – FBB500 ID Number : 773232077    (Phone)

783155836    (Fax)

Email : mastetr.fbb500.773232077@sinotranship.amosconnect.com

Inmarsat FBB250 Number:        773158496 (Voice)

783201964 (Fax)

Email: master.fbb.773158496@sinotranship.amosconnect.com

Inmarsat – C Number        :    4 4 7 7 4 0 3 1 0      GPRY

MMSI Number              :        4 7 7 4 0 3 0 0 0

**\*\* Vessel also equipped GMDSS System \*\***

Name of Owner                  : **Great Prosperity Shipping Inc.**

Registered Owners IMO ID No.: **1843941**

Full-style of Owner's Manager  : **SINOTRANS SHIP MANAGEMENT LIMITED**

21/F., Great Eagle Centre

23, Harbour Road, Wanchai

Hong Kong

Tel: 852-2827 1108

Fax: 852-3753 5860

Tlx:69230 WOSHL HX

Email: operations@sinotranship.com

IMO Company Identification No. :   **1335815**

Remarks   : 1. All the aforesaid information are rendered in good sense but without guarantee.

2. Different Spec. of bunkers to be stored into separate FO tanks in order to avoid
any mixture of oil and affecting the performance of the M/E.

(End)

7

Attachment - 2
**Current and Future Sulfur requirements for Marine Fuel Products**          April 2012

| Operating Area | Regulatory Authority | Product Type | Current Requirements | Aug 1 2012 | Jan 1 2014 | Jan 1 2015 | Jan 1 2020 or Jan 1 2025 (decision to be made by 2018) |
|---|---|---|---|---|---|---|---|
| **A** Global Limit | IMO MARPOL Annex VI | FO | 3.50% | | | | 0.50% |
| | | DO | 2.00% | | | | |
| | | GO | 1.50% | | | | |
| **B** ECA-SOx (Emission Control Area) Baltic & North Sea | IMO MARPOL Annex VI | FO | 1.00% | | | | 0.10% |
| | | DO | | | | | |
| | | GO | | | | | |
| **C** EU Territory (At berth* in E.U. Ports unless published timetables give 'at berth' less than 2 hours) | EU Directive 2005/33/EC | FO | 0.1% | | | | |
| | | DO | | | | | |
| | | GO | | | | | |
| **D** Within 24 nautical miles of Californian coastline | CARB (CARB Regulation) | FO | Vessels are NOT allowed to use Marine Residual Fuel in this area | | | | |
| | | DO | 1.5% for MGO DMA or 0.5% for MDO DMB | | | 1.5% for MGO DMA or 0.5% for MDO DMB | 0.1% for all distillate fuel grades |
| | | GO | | | | | |
| **E** Emission Controls for waters within 200 nautical miles of the United States & Canadian coastlines | IMO MARPOL Annex VI | FO | Areas excluding CARB follows Global Limit 'A'. CARB area (within 24 NM of California) follows 'D' | | | 1.00% | 0.10% |
| | | DO | | | | | |
| | | GO | | | | | |
| **F** The Caribbean waters surrounding the islands of the Commonwealth of Puerto Rico and the United States Virgin Islands, which vary between 20 to 40 nm offshore | IMO MARPOL Annex VI | FO | Follows Global Limit 'A' | | | 1.00% | 0.10% |
| | | DO | | | | | |
| | | GO | | | | | |

* Reference Notification
MRE-SI-07/002 "Responding to Regulatory Controls for low-Sulfur Fuel Oil"issued on April 23, 2007
MRE-SI(FO)-09/001 "Resuming CARB Low sulfur Fuel Regulation"issued on May 11, 2009
MRE-PG(FO)-09/003 "instructions for using low-sulfur marine diesel oil and gas oil"issued on May 22, 2009

*WORKING COPY*

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party,** made and concluded in *London* .................................................... .........15th day of June........................ 19 2012

2  Between *GREAT HOPE SHIPPING LIMITED.*.........................................................................................................................................

3  Owners of the good *Hong Kong* flag...............Steamship/Motorship "*GREAT HOPE*", *Vessel's description see Clause 29*..............................of..........................

4  of......................tons gross register, and...........................................................tons net register, having engines of...........................indicated horse power

5  and with hull, machinery and equipment in a thoroughly efficient state, and classed...............................................................................................

6  at...........................of about......................cubic feet bale capacity and about......................................................tons of 2240 lbs.

7  deadweight capacity, (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8  allowing a minimum of fifty tons) on a draft of........................feet.......................inches on.......................Summer freeboard, inclusive of permanent bunkers,

9  which are of the capacity of about...........................................................tons of fuel, and capable of steaming, fully laden, under good weather

10  conditions about......................knots on a consumption of about.......................tons of best Welsh coal-best grade fuel oil-best grade Diesel oil,

11  now........................................................................................................................................................................................................

12  .... and................................................................................................................................................ *as* Charterers of the

13  *City of*.................................................................................................................................................................................

14  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

15  *about a period time charter of about 17 months / about 20 months in Charterers' option (where about to mean 15 days more or less in*

16  *Charterers' option). Trading via safe port(s), safe berth(s), safe anchorage(s), always afloat, always within Institute Warranty Limits*

17  *(see also trading exclusions). NAABSA is allowed in Argentine grain ports, Uruguay and Brazil only, where it is customary for similar*

18  *vessels or similar size, dimensions and draft to safely lie aground and provided on soft mud/ground* - within below mentioned trading limits.

19  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

20  the fulfillment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Charterers' rights under this

21  *Charter Party*

22  Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot one safe port North China intention Tianjin port in*

23  Owners' option anytime, day or night, *Sundays and Holidays included* .................................................................................................

24  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

25  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be

26  ready to receive *any permissible* cargo with clean-swept holds *and free from loose rust scale and residues of previous cargoes - see also*

27  *Clause 87* and tight, staunch, strong and in every way fitted for the service, having water ballast, winches and

28  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

29  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

30  dise, including petroleum or its products, in proper containers, excluding .... *See Clause 57*......................................................

31  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

32  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

33  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

34  Mexico, and/or South America.................................................................................................................................and/or Europe

35  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, St. Lawrence between

36  October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic,

37  *Trading limits as per Clause 55*...........................................................................................................................................

(Line numbers in the left margin: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32)

*WORKING COPY*

33   as the Charterers or their Agents shall direct, on the following conditions:

34
35   1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew *and all other charges*
36   *related to the Master, Officers and Crew*; shall pay for the
37   insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water *also for garbage removal,*
38   *lubricating oil* and maintain her class and keep
the vessel in a thoroughly efficient state in hull, machinery and equipment *with all necessary certificates to comply with applicable requirements*
*at all ports* for and during the service.

39   2.   That the Charterers *while the vessel is on hire* shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory*,
*customary Pilotages, including Amazon and Orinoco River whole passage including entrance bar, The Baltic Sea from Skagen to Gedser*
*and/or Bornholm and vice versa including Great Belt, The Baltic Sea sound pilot from Skagen to Bornholm and vice versa. Cannakale*
*and Bosporus Strait, the whole Straits of Magellan, Torres Strait and Great Barrier Reef Pilot, Japan inland sea pilots, the Singapore*
40   *pilotage from and to Aobath for bunkering to be for Charterers' account,* Agencies, Commissions, *Canal tolls,*
Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41   a port for causes for which vessel *and/or Owners is /are* responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered
because of
42   illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43   charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~
44   ~~of six months or more.~~

45   Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46   Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47   for dunnage, they making good any damage thereto.

48   3.   ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49   ~~board the vessel at the current prices in the respective ports. The vessel to be delivered with not less than~~..................tons and not more than
50   .................tons and to be re-delivered with not less than...............

51   4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of .................................................................... *including overtime - payable every 15*
52   *days in advance. Charterers to pay the first hire and bunkers on delivery value within 3 banking days after vessel's delivery* ~~United States~~
53   ~~Currency, per ton on vessel's total deadweight carrying capacity, including bunkers and~~
~~stores, on~~....................~~summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid,~~ and at
54   and after the same rate for any part of a *day* month, hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55   wear and tear excepted, to the Owners (unless lost) *on dropping last outward sea pilot one safe port passing Muscat outbound/Japan range*
56   *or in Charterers' option Skaw/Passero range anytime, day or night, Sundays and Holidays included*  unless otherwise mutually agreed.
~~Charterers are to give Owners not less than~~........................................................................................ ~~days~~
57   ~~notice of vessel's expected date of re-delivery and probable port.~~ *See Clause 58.*-

58   5.   Payment of said hire to be made *as per Clause 30* ~~in New York~~ in cash in United States Currency, semi-monthly *every 15 days* in advance,
and for the last *15 days* ~~half-month~~ or
59   part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60   due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61   hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62   terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers *following the provisions of Clause 31.* Time to count
*as from vessel's delivery* ~~from 7 a.m. on the working day~~
63   ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64   ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65   Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66   to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

WORKING COPY

of such advances.

67
68  6.    That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or *anchorage or*  place that Charterers or their Agents may
69  direct, provided the vessel can safely lie, always afloat at any time of tide, except at such places *in Argentine grain ports, Uruguay and Brazil only,*
    *where it is customary for similar vessels of similar size, dimensions and draft to safely lie aground and provided on soft mud/ground*
    ~~where it is customary for similar size vessel to safely~~
    ~~lie aground.~~

70
71  7.    That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow. Charterers~~
74  ~~paying Owners ............. per day per passenger for accommodation and meals. However, it is agreed that in case any fines or extra expenses are~~
75  ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

76
77  8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
78  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
    agency; and Charterers are to load, stow, and trim *and discharge* the cargo at their expense under the supervision of the Captain, who is to sign, *or is to*
    *authorize Charterers' to sign* Bills of Lading for

79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts.
80  9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments. *This provision does not affect the*
    *Charterers' right to advance any claim or require Arbitration under clause 17 of dispute, regarding the conduct of the Master in*
    *prosecution of voyages and carrying out the orders and direction of the Charterers.*

82  10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of $10.00 per day. *Charterers to pay Owners US$ 1,350.- per 30 days / pro-rata,  for meals, representations, beverages, drinks,*
    *cigarettes, communications, radio expenses and cables* ~~Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers of~~
    ~~their Agents, to victual Tally~~

85  ~~Clerks, Stevedore's Foreman, etc. Charterers paying at the current rate per meal, for all such victualling.~~
86  11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log *in English* of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the
    Char-

88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89  sumption of fuel.
90  12.    That the Captain shall use diligence in caring for *care and* the ventilation of the cargo.
91  13.    ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ...............................................................................

92  ...............................................................................
93  ~~on giving written notice thereof to the Owners or their Agents~~ ............... ~~days previous to the expiration of the first named term, or any declared option~~
94  14.    That if required by Charterers, time not to commence before *22nd June 2012* ........................................................... and should vessel
95  not have *been delivered* ~~given written notice of readiness~~ on or before *5th July 2012* ................... ~~but not later than 4 p.m.~~ Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Hire to be settled basis GMT, but*
    *laycan to be based on local time.*

97  15.    That in the event of the loss of time from deficiency, *sickness, strike, accident or default of Master , Officers or Crew* of men or stores,
    fire, breakdown or damages to hull, machinery or equipment,
98  grounding, detention by average accidents to ship or cargo, *unless resulting from inherent vice, quality or defect of the cargo* drydocking for the
    purpose of examination or painting bottom, or by any other cause
99  preventing the full *use of the vessel to the Charterers* ~~working of the vessel,~~ the payment of hire shall cease for the time thereby lost; and if upon the
    voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, *and all extra expenses incurred including bunker*
    *consumed during period of suspended hire shall be for Owners' account,*  and the cost of any extra fuel consumed in consequence

WORKING COPY

thereof, and all extra expenses shall be deducted from the hire, *against evidence bunker price as per Charterers' last bunkering voucher.*

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property. *In case of property, Owners and Charterers to share equally return of salvage*

17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred *to as per Clause 71* ~~three persons at New York,~~ ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~ ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.

19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, and 17 to 22, inclusive, and Rule F of *York-Antwerp Rules 1994* ~~1924, at each port or place in the United States as may be selected by the carrier, and as to matters not provided for by these~~ ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~ ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~ ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~ ~~bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such deposit as the carrier~~ ~~or his agents may deem sufficient to additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~ ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~ ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~ ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~ ~~United States money.~~

~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage, resulting from any cause whatsoever,~~ ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~ ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~ ~~losses, or expenses of a general average nature that may be incurred, and shall pay salvage and special charges incurred in respect of the~~ ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~ ~~ships belonged to strangers.~~

Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *Hire shall not be contributed to General Average.*

20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.

~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~ ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~ ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

*See Clause 59.* .....................................................................................................................................................................

22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also providing ropes, *equipment,* falls, slings and blocks *as on board.* ~~If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide~~ ~~necessary gear for~~

same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide, *free of expense, sufficient electric lighting with vessel's light clusters to permit work at hatches and overboard at the same time on the* ~~vessel, lanterns and oil for~~ ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The Charterers to have the use of any gear on board the vessel.

101
102
103
104
105
106
107
108
109
110
111
112
113
114
115
116
117
118
119
120
121
122
123
124
125
126
127
128
129
130
131
132
133
134
135
136
137
138
139
140
141
142
143
144

*WORKING COPY*

145 23.  Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
146 steamer to provide one winchman per hatch to work winches day and night as required. Charterers agreeing to pay officers, engineers, winchmen,
147 deck-hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148 port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149 insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150 thereby.
151 24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153 etc." in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154 of which are to be included in all bills of lading issued hereunder.

155                                        U.S.A. Clause Paramount
156 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159 be repugnant to said Act to any extent, such term shall be void to that extent but no further.

160                                        Both-to-Blame Collision Clause
161 If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162 Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163 hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164 or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165 carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166 owners as part of their claim against the carrying ship or carrier.
167 25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. *Vessel not to force ice, nor be obliged to follow ice breakers.*
170 26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.
172 27.  A commission of 1 1/2 *1.25* per cent is payable by the Vessel and Owners
173
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28.  An address commission of 2 1/2 *3.75* per cent payable to *Charterers* ...... on the hire earned and paid under this Charter, *to be deducted from
hire.*

*Additional Clauses No. 29 to 112, both inclusive, as attached, to form part of this Charter Party.*


*THE OWNERS:*                                            *THE CHARTERERS:*



This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

*WORKING COPY*

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

**Clause 29 Vessel's Description**

**"MV GREAT HOPE"**
Time Charter description as Attached

ECO SPEED/CONSUMPTION:

LADEN: RPM 88, ABT 22.5/MT + MDO 0.2/MT @ ABT 11.5/KTS
BALLAST: RPM 88, ABT 22.5/MT + MDO 0.2/MT @ ABT 12.5/KTS

THE ABOVE FIGURE BASIS CALCULATION ONLY BASIS GOOD WEATHER/SEA CONDITION
AND SUBJECT TO ACTUAL RUNNING TEST AND THEREFORE WITHOUT GUARANTEE.

**Clause 30**
First hire and bunkers value to be paid to Owners within 3 banking days after vessel's delivery.

Hire / Bunkers are payable to Owners' bank:

SINOTRANS SHIPOWNING LTD
Banker: Bank of China (Hong Kong) Limited
Account No. : 012-884-9-213178-2
Banker's address: G/F., China Resources Building, 26 Harbour Road, Hong Kong.
Swift Code: BKCHHKHH

**Clause 31**
    (a)  Payment
All kind of taxes and/or bank charges levied on hire payment before it is received in owners' bank
account to be for charterers account i.e. owners are to receive hire payment in full (100%). If hire or
part of any installment thereof is not paid in accordance with the terms and conditions of this
charter party and as long as the hire due or part remains unpaid, the owners shall be entitled to
suspend the performance of any and all of their obligations hereunder and shall have no
responsibility whatsoever for any consequences thereof, and the hire shall continue to accrue and
any extra expenses resulting from such suspension shall be for charterers account until actual
receipt of the payment. The Charterers shall indemnify the Owners in respect of any liabilities
incurred by the Owners under the Bill of Lading or any other contract of carriage as a consequence
of the Owners' suspension of and/or withdrawal from any or all of their obligation under this
Charter Party.

Notwithstanding anything to the contrary contained herein, it is understood that if at any time
during the currency of this charter the hire shall become due on a Saturday, Sunday or Holiday,
payment of hire must be received on the banking date immediately proceeding the date on which
hire becomes due.

Should the vessel be on her voyage towards port of redelivery at the time the last and/or penultimate
payment of hire is due, said payment is to be made for such length of time as the owners and the
charterers may agree upon as being the estimated time necessary to complete the voyage, and taking
into account bunker actually on board, to be taken over by the owners and estimated disbursements
for the owners account before redelivery. Should same not cover the actual time, hire is to be paid
for the balance, day by day, as it becomes due. When the vessel has been redelivered, any



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

difference is to be refunded immediately by the owners or paid by the charterers, as the case may be.

In the event that charterers failing the punctual and regular payment of the hire, or on any fundamental breach of this Charter-Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers without prejudice to any claims they (the Owners) may otherwise have on the Charterers.

(b) Grace Period
Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors or omissions on the part of the Charterers of their bankers, the Charterers shall be given by the Owners three clear banking days (as recognized at the agreed place of payment or in New York or in London or in Zurich) written notice to rectify the failure, and when so rectified within those three clear banking days following the day of Owners' notice, the payment shall stand as regular and punctual. Failure by the Charterers to pay the hire within three days of receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw as set forth in Sub-Clause (a) above.

(c) Last Hire Payment
Should the vessel be on her voyage towards port of redelivery at the time the last and / or the penultimate payment of hire is / are due, said payment(s) is / are to be made for such length of time as the Owners and the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking into account bunkers estimated on board on redelivery, to be taken over by the Owners and estimated disbursements for the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the balance, day by day, as it becomes due. When the vessel has been redelivered, any difference is to be refunded by the Owners or paid by the Charterers, as the case may be.

**Clause 32**
Charterers to have the right to withhold from Charter hire, during the period of this Charter, such amounts due to off-hire and Owners' disbursements, but properly substantiated. Charterers to have the right to withhold from last hire payments Owners' estimated advances and disbursements, including any fines and any other accounts for Owners' account and also the value of the estimated quantity of bunkers on redelivery. However, final accounting to be arranged by Charterers as promptly as possible. Any and all undisputed balance of hire at the time of redelivery of the vessel should be properly settled promptly in time within 30 days after vessel redelivered from Charterers.'

**Clause 33**
In the event of the vessel being boycotted by I.T.F., delayed or rendered inoperative by strikes, labour stoppages, or by any other difficulties due to vessel's flag, Ownership, Crew, terms of employment of Officers or Crew or any other vessel under the same Ownership, operation or control, all time lost is to be considered as off-hire and expenses incurred thereby to be for Owners' account.

**Clause 34**
Should the vessel be seized or detained by any authority, or arrested at the suit of any party having or purporting to have a claim against any interest in the vessel, hire shall not be payable in respect of any period during which the vessel is not fully at Charterers' use and all extra expenses and consequential actual losses which proved by Charterers shall be for Owners' account, unless such seizure or detention is occasioned by any personal act or omission or default of the Charterers or their Agents, or by reason of cargo carried.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

**Clause 35**
Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account, if caused by Charterers or by Charterers' servants and to be for Owners' account, if caused by Master, Officers, Crew or Owners' servants.

**Clause 36**
Charterers to have the option to add all or any part of a period of more than 1 (one) day off-hire time incurred during this Charter-Party to the Charter period, however same to be declared at least one month prior to definite redelivery of the vessel. At Owners' request, Charterers to provide details of added off-hire period.

**Clause 37**
Any delay, expense or consequential loss by reason of non-compliance with regulations, lack of proper documentation of equipment as per Clauses No. 29 and 44 to 48 or on any breach of said Clauses to be for Owners' account.

**Clause 38**
If Stevedores, longshoremen or other workmen are not permitted to work due to failure of the Owners to comply with Clause 48, or because of lack of said certificates, any time so lost shall be treated as off-hire, and all extra expenses incurred, directly resulting from such failure, shall be for Owners' account.

**Clause 39**
Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers, the hire is to be suspended from the time of her deviating or putting back until she is again in the same or equidistant position from the destination and the voyage resumed therefrom.

All fuel used by the vessel while off-hire shall be for Owners' account.

**Clause 40**
Hire as specified in Clause 4 to include among other operations, usually performed by the Crew as if vessel was trading for Owners' account unless prohibited by shore regulations such as :

1) Opening and / or closing of hatches ;
2) Supervision of loading and discharging ;
3) Docking / undocking / shifting / ballasting and bunkering ;
4) Shape up hatches / holds as much as possible prior to arrival at loading and/or discharging port / docks / anchorage if Master considers safe, so that loading and/or discharging operations can commence immediately.

**Clause 41 Bunkers Clause**
Bunkers on delivery about 360 metric tons LSFO, about 860 metric tons HSFO and about 50 metric tons MGO.

Bunkers on redelivery about same quantity as bunkers on delivery.

Bunker prices at U.S. $640 per metric ton for LSFO, U.S. $600 per metric ton for HSFO and U.S. $890 per metric ton for MGO both ends.

Charterers' option to replenish IFO RMF 180 ISO8217:2005E in South Africa.

Owners have the right to bunker the vessel during the Charter period provided same does not interfere with Charterers' cargo operations / cargo intakes.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

Charterers' option to replenish bunkers prior vessel's delivery provided same does not interfere with Owners' operations.

**Clause 42**
Charterers to have the privilege to bunker vessel prior to delivery, provided the bunkering does not interfere with Owners' normal operations. Similar privilege is granted to Owners prior to redelivery.

**Clause 43**
Owners warrant that vessel is eligible and equipped to bunker in the USA, its territories and possessions and in all countries to which vessel is allowed to trade under the Charter.

**Clause 44 Certificates / Warranties Clause**
The Owners are to provide and keep on board valid SSCEC (Ship Sanitation Control Exemption Certificate) throughout the Charter period.

Deratization exemption shall always be for Owners' account.

**Clause 45**
Throughout the period of the Charter, vessel to be in possession of all necessary valid equipment and certificates to comply with Safety and Health Regulations, national and international regulations and all current requirements at all ports of call, Panama and Suez Canal, included Crew vaccinations.

**Clause 46**
For the carriage of grain in bulk, vessel to have on board throughout this Charter period valid documents and certificates issued by the Classification Society and/or national authority and accepted by National Cargo Bureau Ministry of Transport on the basis of SOLAS 1974 Regulations and latest amendments thereto.

**Clause 47**
Vessel to be fit for grab / vacuvator discharge and no cargo to be loaded in places inaccessible to grabs or in deeptanks. Charterers to have the privilege of using bulldozers in vessel's holds.

However, unit weight of bulldozers will not exceed vessel's tanktop strength and their operations always to be under Master's supervision.

**Clause 48**
The Owners undertake that all equipment shall conform with regulations in all ports visited by the vessel, and that the vessel is at all times in possession of valid certificates to comply with such regulations.

**Clause 49**
Owners warrant that the vessel has not traded Israel and is not blacklisted by Arab countries.

**Clause 50**
**INTERNATIONAL GROUP OF P&I CLUBS FINANCIAL SECURITY IN RESPECT OF POLLUTION CLAUSE**
1. Owners warrant that throughout the currency of this charter they will provide the vessel with the following certificates:

(a) If the vessel is over 1,000 gross tons and is registered in, or is required to enter a port or offshore facility in the territorial sea of, a State Party to the International Convention on Civil Liability for Bunker Oil Pollution Damage 2001, a Certificate issued pursuant to Article 7 of that Convention.



# Additional Clauses to M/V "Great Hope"
## Charter Party dated 15th June 2012

(b) If the vessel is constructed or adapted for the carriage of persistent oil in bulk as cargo and is carrying more than 2,000 tons of such cargo, a Certificate issued pursuant to Article 7 of the International Convention on Civil Liability for Oil Pollution Damage, 1992, as applicable.

(c) If the vessel is over 300 gross tons (or as might otherwise be required by US Federal Statutes and Regulations) and is required to enter US navigable waters or any port or place in the US, a Certificate issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with US Coast Guard Regulations, 33 CFR Part 138.

2. Notwithstanding anything whether printed or typed herein to the contrary,
(a) Save as required for compliance with paragraph (1) hereof, Owners shall not be required to establish or maintain financial security in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.

(b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) which Owners may sustain due to non-compliance with any demand or requirement to establish or maintain financial security in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c) Without prejudice to paragraphs 2(a) and 2(b), if Owners establish or maintain financial security other than to the extent provided in paragraph (1) hereof (in order to enable the vessel lawfully to enter, remain in or leave any port, place or waters), Charterers shall, unless otherwise expressly agreed, indemnify Owners and hold them harmless in respect of any costs or delay incurred in establishing or maintaining such security.
(d) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any bill of lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

3. Charterers warrant that the terms of this clause will be incorporated effectively into any bill of lading issued pursuant to this charter.

4. Owners warrant that they are insured for pollution liability by a P & I Club member of the International Group of P & I Clubs up to U.S. $1,000 million.

**Clause 51**
Extra insurance, if any, owing to vessel's class and / or flag to be for Owners' account.

**Clause 52**
In the event of outbreak of war between any of the following countries:

United States of America, the country of vessel's flag, C.I.S., People's Republic of China, United Kingdom, Japan, France, Germany, both Charterers and Owners have the option of cancelling this Charter-Party.

It is understood that war means direct war between these nations and does include local hostilities or civil war where any of the above countries support opposing sides. Owners shall not unreasonably take advantage of this Clause in case of a limited local conflict.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

**Clause 53**
The normal war risk insurance premium on the vessel's hull and machinery value are for Owners' account, but any increase of same due to vessel's trading into an excluded area to be for Charterers' account.

Value of H and M: U.S. $24 million
I/V: U.S. $12 million
War Risk: U.S. $36 million

**Clause 54 Bills of Lading / Cargo Claims**
This Charter-Party is subject to the following Clauses all of which are also to be included in all Bills of Lading issued hereunder :

Clause Paramount, New Jason Clause, New Both-to-Blame Collision Clause, BIMCO Conwartime 2004.

**Clause 55 Trading Limits**
Trading to be worldwide between safe ports, safe berths and safe anchorages and places, always afloat, always within the institute warranty limits excluding war and warlike zones and excluding Albania, Nicaragua, El Salvador, Finland, Honduras, Syria, Lebanon, Libya, Cuba, Ethiopia, Somalia, Tanzania, Kenya, Nigeria, Angola including Cabinda, Kampuchea, North Korea, Sri Lanka(except bunkering at Sri Lanka), Iran, Israel, Haiti, Russia pacific ports, Great Lakes, Namibia, Croatia, Bosnia, St. Lawrence Seaway west of Montreal, Iraq, Kuwait, Yemen/People's Republic of Yemen (North and South Yemen), Amazon River and Orinoco River. Any extra and/or additional insurance premium charged by the Owners underwriters, any blocking/trapping/ detention insurance and any crew bonuses to be for Charterers account.

Charterers not to trade vessel directly between mainland China and Taiwan.

The vessel is allowed for bunkering at opl Sri Lanka only provided weather permits and master considers it safe for bunkering operation. Any time lost due to bunkering in Sri Lanka shall be for Charterers' account.

Norway, Sweden and Denmark are allowed but Charterers should give at least 10 days prior notice before such calling.

Alaska is allowed to trade during 16th April to 15th October but subject to Owners' approval which not to be unreasonably withheld and any additional premium, crew bonus and hiring of extra mooring ropes, tugs, pilots etc if necessary according to port regulations, due to Charterers breaching IWL to be for Charterers account.

Gulf of St. Lawrence is permitted but excluded between 1st December and 30th April. In case when there is no ice and navigation is safe in the Gulf of St. Lawrence during the excluded period, Charterers are allowed to arrange vessel sail to Gulf of St. Lawrence subject to Owners prior approval but any additional premium for breaching IWL in Gulf of St. Lawrence shall be on Charterers account. Charterers are required to tender at least 7 working days prior notice to Owners for necessary pre-arrangements. Meantime, St. Lawrence River West of line Baie Comeau/Matane is fully excluded between 1st December to 30th April despite Charterers paying Owners any additional premium.

For Alaska/St. Lawrence River / Baltic / Sweden / Denmark / Norway / trading or any places where ice could occur always provided where are safe and open to navigate for non-ice strengthened vessels of similar size and dimensions. In any event, vessel shall not be obliged to force ice and master has absolute discretion to refuse to proceed, if he considers it dangerous, and/or to sail to a convenient open place, if he considers it dangerous to remain at any loading or discharging or waiting place for fear of the vessel being blocked/frozen in, to await Charterers fresh instructions. Unforeseen detention or deviation through the



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

above to be entirely for Charterers account any extra and/or additional insurance premium charged by Owners underwriters, and any blocking/ trapping/additional insurance shall be for Charterers account.

Vessel not to force ice nor be obliged to follow ice-breaker.

Charterers are not allowed to trade via Magellan strait or Cape Horn from May to October.

Charterers have the option to trade to Persian Gulf and countries of former Yugoslavia unless when there is declaration of war as per announcement of Owners' underwriters but Iraq and Iran are always excluded and Kuwait is only allowed prior to Owners permission. Any extra and/or additional insurance premium charged by Owners' underwriters, any blocking/trapping/detention insurance and any crew bonuses shall be for Charterers account.

Charterers have option to trade to Amazon River up to and including Trombetas and Orinoco River upto and including Puerto Ordaz once each during charter party period which not to be traded consecutively basis Owners' Protective Clause:

Charterers guarantee Amazon River and Orinoco River are always accessible/afloat and safe for ship trading. Charterers are responsible for all tugs/pilotages/protection applied by the master and master has the sole discretion to adopt any reasonable action if he thinks it is necessary for safety of the vessel whilst the vessel is always on-hire. All extra expenses not covered by vessel's insurance will be for Charterers' account including deductible and eventual increase of insurance premium due to the accident. In case vessel is instructed to call at ports in the Amazon River if due to the strong currents the mooring ropes are broken any time lost due to that and cost of repairing same to be for Charterers account.

For trading to Amazon River the pilotage either at north entrance bar or Espadarte pilot station to and from Fazendina pilot station should be for Charterers' account.

Gulf of Aden to be allowed to transit 4 times throughout the currency of this charter party against Owners' below piracy clause.

(Comment for trading West Coast India/Pakistan/allowed ports in Persian Gulf: Owners advise vessel to sail within 30 nautical miles of India/Pakistani coast, with anti-piracy materials on board, paying crew bonus. No additional premium for calling ports south of Mumbai including Mumbai. No armed guards required till now)

**Clause 56 Piracy Clause**

(a) Deleted.

(b) Deleted.

(c) If the Owners consent or if the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners shall have the liberty:



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

(i) to take reasonable preventative measures to protect the Vessel, her crew and cargo including but not limited to re-routeing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel or equipment on or about the Vessel;

(ii) to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the terms of the insurance;

(iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group, including military authorities, whatsoever acting with the power to compel compliance with their orders or directions; and

(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by the Vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-clause (d)(iii).

(d) Costs

(i) If the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid Piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;

(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;

**(iii) If the underwriters of the Owners' insurances require additional premiums or additional insurance cover is necessary because the Vessel proceeds to or through an Area exposed to risk of Piracy, then such additional insurance costs shall be reimbursed by the Charterers to the Owners;**

(iv) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(e) If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire.

(f) If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as of the ninety-first (91st) day after the seizure and shall resume once the Vessel is released. The Charterers shall not be liable for late redelivery under this Charter Party resulting from seizure of the Vessel by pirates.

(g) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but

8



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail to the extent of such conflict, but no further.

It is explicitly agreed that:

(h)  It shall be in the sole discretion of the Owners to only follow Chinese/South Korean/Japanese Navy escorts and/or convoys and doing so (including waiting for such escorts and or convoy) shall be deemed to constitute a reasonable preventive measure, notwithstanding the availability of any other escorts and/or convoys, and

(i)  It shall be in the sole discretion of the Owners to instruct the Master to take a further West Indian coastal course after leaving or before joining the navy escort.  It shall be in the sole discretion of the Owners to instruct the Master to take a further West Indian coastal course and a course on the east of Diego Garcia and Rodriguez Island, to and from Persian Gulf/Red Sea/West Coast India and Cape of Good Hope/South African countries. Taking such courses shall be deemed to constitute a reasonable preventive measure, and

(j)  The owners have the liberty to cover the vessel for kidnap and ransom insurance payable by the charterers against the invoice of the Owners' underwriters, and

(k)  The Owners have the liberty to put security guards on board at Charterers' time and expenses and any deviation for picking up and dropping the guards shall be for Charterers' account.

Clause 57 Cargo Exclusions Clause
**Vessel can be employed in carrying lawful merchandise cargoes but always excluding cargoes as set forth in Appendix 'B' of Code of Safe Practice for Solid Bulk Cargoes 2001 edition and any subsequent new editions thereof and amendments there to, and excluding cargoes restricted by the United Nations and under U.N. Embargo, and excluding livestock, injurious, inflammable and dangerous goods, acids, ammunition, explosives, detonators, black powder, blasting caps, loaded bombs, dynamite and TNT, calcium carbide, calcium hypochloride, ferrosilicon, naphtha, asbestos, zinc ashes, caustic soda, motor spirit, tar and its products, salt, petroleum and its products, arms and war materials, scrap of any kind, motor blocks and turnings, steel slab, asphalt, pitch in bulk, nuclear materials, cement/cement clinker in bulk, radioactive products, wastes, fishmeal, hides, ammonium nitrate, ammonium phosphate and ammoniums, creosoted goods, charcoal in gunny bags, copra, sponge-iron (direct reduced iron pellets), pond coal, logs of any kind, sludge ore, oil cakes, bones, resin, concentrates of any kind, sulphur, petcoke, harmful and corrosive fertilizers (dap/mop allowed), technical urea, sunflower seed expellers, cotton seed, manioc pellets, HBI of any kind, nickel ore, bagged rice to African countries. Any deck cargoes are fully excluded.**
**All cargoes to be loaded/stowed/trimmed/separated/discharged in accordance with IMO and local authorties' rules, guidelines, recommendations.**

**Vessel is not to be traded for more than max 2 consecutive short haul (say less than 20 days round voyage) of ore, coal, bauxite, aggregate or aluminium, etc trading.**

**Charterers have the option to load alumina in bulk, however for whatever reasons Owners shall not be held responsible if the vessel fails hold inspection for such cargo.**

**Charterers have the option to load maximum 5 cargoes out of salt, sulphur (including rocksalt and solar salt), petcoke or pig iron during the whole charter period but maximum 3 cargoes of each. Such dirty cargoes should not be loaded consecutively and should not be last cargo before redelivery.**



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

When loading sulphur or salt Charterers should arrange at their time and expense, shore labour to conduct lime washing or hold block and cleaning/removal of lime wash or hold block in cargo holds to master's satisfaction, and supply sufficient fresh water and chemicals for applying lime wash, removing lime and washing down the holds. Furthermore, the cargo is to be loaded, carried and discharged in accordance with IMO or equivalent safety regulation.

The cargo of sulphur allowed to load should be only 'lump and coarse-grained sulphur' formed to a specific shape (e.g. prills, granules, pellets, pastilles or flakes) provided, however, the cargo should not be classed as IMDG 4.1 and should be loaded always in accordance with IMO and SOLAS regulations. 'Fine grained sulphur', 'sulphur of molten' and 'flowers of sulphur' should always be excluded.

The Charterers have the option to load petcoke as per above limits provided such cargo is non-oily petcoke and carried in accordance with USCG regulations where appropriate and otherwise as per local and IMO regulations. Charterers should supply their labour and sufficient fresh water and chemical detergent and equipments at their expenses and time for washing down of holds.

Charterers have the option to load pig iron as per above limits basis following conditions:

1) Charterers are to load pig iron slowly and carefully into holds at master's, and government inspector's satisfaction avoiding any damage on tank-top, side tanks, etc. Charterers understand that loading of first layer of pig iron not to be released directly hitting tank-top. First layer of pig iron to be loaded and dropped onto wood pallets laying on cargo holds tank top acting as protection to avoid direct landing. Any removal of pallet debris to be for Charterers' account.
2) Charterers to put plywood and/or polythene to adequately protect the windows and accommodation and cover all deck with suitable materials prior to loading which to be done in Charterers' time and expense. Same is to be removed in Charterers time and expenses prior departure.

3) notwithstanding what has been specified under the stevedores damage clause under the charter party, prior to such cargo loading, cargo hold pre-condition joint survey to be carried out by independent surveyors for Charterers account. Same survey to be carried out upon completion of such discharge. Owners to be notified well in advance and to be provided reasonable ample time for arranging such survey. Charterers shall be held fully responsible for any damage arisen from the carriage of pig iron, and rectify such damage soonest after discharging of cargo.

For loading salt/sulphur/petcoke/pig iron, if Charterers require assistance of crew to clean the holds Charterers should pay crew special bonus which to be agreed between Charterers and master directly. The size of bonus to be customary for such trade and work. Such crew special bonus to be extra and additional to intermediate hold cleaning as agreed between Owners and Charterers. The Owners are not responsible if Charterers and master/crew cannot reach an agreement on details of above assistance. Howsoever, Owners/vessel will not be responsible for the cleanliness of holds conditions, and any extra cleaning, if required, shall be for Charterers account and all necessary materials, tools and equipment required and fresh water shall be supplied by Charterers.

Charterers' option to load maximum one cargo of copper concentrate basis following conditions:

1) Cargo always to be loaded, stowed, carried and discharged in accordance with local and national regulations and in full compliance with IMO regulations.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

2) Prior to commencement of loading concentrates, the intended cargo is to be subjected to an independent analysis for account of shippers/ Charterers. Appropriate certificates indicating actual transportable moisture limit (as defined by the IMO) on shipment to be furnished to master.

3) Charterers warrant that intended cargo will comply in all respects with all relevant national and international regulations.

4) Charterers warrant cargo non-corrosive and non-harmful subject to the limitation of IMO cargo and cargo exclusions.

5) before loading cargoes all necessary separations, if any, to be properly erected upto surveyor's and master's satisfaction at Charterers' time and expenses and cargo to be loaded, stowed, separated, trimmed, discharged, etc., upto IMO and board trade regulations. Charterers to allow Owners to appoint p' and i surveyor or independent surveyor at Charterers' expenses to supervise loading, stowing, execution of separation etc. To surveyor's approval and master's satisfaction at Charterers' time and expenses.

6) Before loading concentrates Charterers to supply vessel with shippers' certificate of flow moisture content evidence cargo's compliance with IMO regulations, without which master may reject to load and Charterers should be responsible for the consequences.

7) After loading cargo must be properly trimmed at Charterers' time and expenses to surveyor's and master's satisfaction. Test samples should be established as true representative of the consignment prior to loading by surveyors agreed by Owners / Charterers at Charterers' expenses. Surveyors to be paid directly by Charterers. Separations required for different parcels of cargo to be supplied to vessel and erected in holds at Charterers' time and expenses.

It is understood that above vessel has no valid securing manual on board, in case Charterers will load cargo which need said manual, all time/cost/expenses for obtaining the manual to be for Charterers' account.

Charterers are allowed to load steel products including steel slabs basis following conditions:

1) The Charterers pay U.S. $20,000 for compensating ship's holds paints loss and such funds to be remitted to Owners' bank account together with hire payment.

2) All dunnage, lashing and securing arrangement shall be done by Charterers to master's satisfaction and all time and expenses to be for Charterers' account.

3) All dunnage and lashing debris shall be removed from vessel and to be disposed off at Charterers time, expenses and risk.

4) Charterers guarantee they will not do any welding on the vessel for loading such cargoes.

5) Owners have option to arrange both loading and discharging (pre) condition survey by competent surveyors at Charterers expenses. Surveyors' remarks to be claused in mates receipt and bills of lading. Copies of survey reports to be given to the master and also dispatched to the Owners soonest for reference. Owners are not responsible for any damage caused to cargoes during loading and discharging.

6) California block stowage is strictly forbidden.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

Iron ore and/or iron ore pellets and/or iron ore fines and/or iron ore concentrate to be always loaded according to latest I.M.O. regulations but always excluding directly reduced iron ore and directly reduced iron ore pellets.

**Clause 58**
Delivery Notice
On delivery, Owners to tender 6/5 days approximate and 3/1 definite day(s) notice.

Redelivery Notice
On redelivery, Charterers to tender 20/15/10 days approximate and 7/5/3/2/1 day(s) definite notice of redelivery with name of redelivery port.

**Clause 59 Dry-dock Clause**
During the currency of this Charter Party dry dock to be allowed only in case of emergency.

**Clause 60 Stevedore Damage Clause**
Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damage to the vessel caused by Stevedores provided the Master has notified the Charterers and/or their Agents in writing as soon as practical but not later than 48 hours after any damage is discovered, but latest on sailing load / discharge port. Such notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent of such damage.

(A)In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the Crew and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed and if required passed by the Vessel's classification society.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

(B)Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option, before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the Owners' work.

**Clause 61 Cargo holds**
Intermediate cleaning of holds if required by Charterers to be performed by vessel's crew provided local authorities, weather conditions and time permits. Charterers to provide tools and other materials as per master's requirements. In any event, however, owners/ master/ officers/ crew are not responsible if vessel fails to pass holds inspections. Charterers to pay U.S. $700 per hold for each such cleaning. If local port or labour regulations do not permit crew to clean the holds, charterers to arrange for shore labour at their expense and time. Any extra cleaning, which are required by any of relevant parties, including but not limited to any governmental bodies and/or Charterers /sub-Charterers and/or shippers and/or independent surveyors, to be for Charterers' account and time.

Throughout the currency of this charter party, the charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of cargo related residues and/or hold washing water and/or chemicals and detergents and/or waste as defined by Marpol Annex V, section 1 or other applicable rules relating to the disposal of such substances.

**Clause 62**
Charterers have the right to instruct Master to utilize the vessel's maximum water ballast capacity and eventually to flood No. 4 hold only, in order to bring down vessel's height to get into position under loading and / or discharging appliances, however, always in conformity to free board and / or safety requirements.

**Clause 63 Agency Clause**
Charterers agree to have their Agents, if required by the Owners, to all Owners' matters, Owners in such case to refund Agents' outlays and to pay them customary agency fee in full but normal ship's husbandry (immigration, Crew mail, cash advance) which shall be taken care of by Charterers' Agents without agency fee except the agency fee tariff, valid for the respective port includes a general husbanding fee for the Owners. Owners have the right of appointing and paying their own Agents.

**Clause 64**
All reference to time is understood to be in local time, but hire calculations to be based on G.M.T.

**Clause 65 Bill/s of Lading**
(a) The Master shall sign the Bills of Lading or Waybills for cargo as presented in conformity with Mate's or Tally Clerk's receipts. However, the Charterers or their Agents may sign Bills of Lading or Waybills on behalf of the Master, always in conformity with Mate's or Tally Clerk's receipts.

(b) All Bills of Lading or Waybills shall be without prejudice to this Charter-Party and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter-Party and any Bills of Lading or Waybills signed by the Charterers or by the Master at their request.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

(c) Charterers and / or their Agents and / or their nominees have the right to issue and sign sea waybills in lieu of Bills of Lading in Japan only for those shippers with whom Charterers have contracts allowing or requiring sea waybills to be used. At the discharging ports, cargo to be released to the consignees named in the sea waybill without Charterers' presentation of this sea waybill to the Master and the Charterers shall check the identity of the consignees before the cargo is delivered, in which case Charterers shall indemnify and keep Owners and the vessel harmless from all consequences arising from doing so in this regard. Needless to say, Charterers shall not issue any LOI view nature of sea waybill.

(d) Charterers to make every effort to ensure that Original Bills of Lading are tendered to the Master / Agent upon vessel's arrival at discharging ports, should the Bills of Lading be unavailable at that time Owners / Master agree to release the entire cargo to the Receiver (s) which identified by the Charterers into their Letter of Indemnity on condition that :

Prior to vessel's arrival at discharging port, Charterers to courier Owners in Charterers' letter heading an original Letter of Indemnity signed by the Charterers' authorized signature(s) with full name and capacity in block letter and duly stamped, holding Owners or their servants harmless in respect of any liability, loss and damage of whatsoever nature which they may sustain by reason of such authorized release of cargo without Original Bills of Lading, and Letter of Indemnity wordings to be as per Owners' P and I Club. Charterers to give maximum 1 working day for Owner to verify and accept the LOI.

Charterers are also required to provide if possible copies of Bills of Lading (if any), or Mate's Receipt to verify whether all the particulars at Charterers' Letter of Indemnity fully conform with cargo documents. Owners shall instruct Master of the vessel to discharge / release the cargo without Original Bills of Lading against acceptable fax copy of Letter of Indemnity but Charterers to unfail courier Original Letter of Indemnity to Owners.

It is expressly agreed that once the original Bills of Lading are received by Charterers or Receivers same shall be surrendered to Owners if traceable and as soon as possible after completion of the discharge and that any consequences as a result of such non compliance to be for Charterers' account.

If Charterers fail the strict compliance of all above conditions and procedures, Owners are at their sole discretion to reject the request for the release of cargo without Original Bills of Lading.

Split Bills of Lading
At the request of Charterers, Charterers and/or Agents are hereby authorized by Owners/Master to split Bills of Lading and issue delivery orders against collection of full set of original Bills of Lading by Owners, before vessel's arrival at discharging port.

Delivery orders shall conform with all terms, conditions and exceptions of Bills of Lading and shall not prejudice Owners' rights.

**Clause 66**
**Ship To Ship Transfer Clause for Time Charter Parties**

(a) The Charterers shall have the right to order the vessel to conduct ship to ship cargo and/or bunkering operations, including the use of floating cranes and barges. All such ship to ship transfers shall be at the Charterers' risk, cost, expense and time.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

(b) The Charterers shall direct the vessel to a safe area for the conduct of such ship to ship operations where the vessel can safely proceed to, lie and depart from, always afloat, but always subject to the Master's approval. The Charterers shall provide adequate fendering, securing and mooring equipment, and hoses and/or other equipment, as necessary for these operations, to the satisfaction of the Master.

(c) The Charterers shall obtain any and all relevant permissions from proper authorities to perform ship to ship operations and such operations shall be carried out in conformity with best industry practice.

(d) If, at any time, the Master considers that the operations are, or may become, unsafe, he may order them to be suspended or discontinued. in either event the Master shall have the right to order the other vessel away from the vessel or to remove the vessel.

(e) If the Owners are required to extend their existing insurance policies to cover ship to ship operations or incur any other additional cost/expense, the Charterers shall reimburse the Owners for any additional premium or cost/expense incurred including the cost of separate or additional insurance for the deductible under the vessel's hull and machinery insurance.

(f) The Charterers shall indemnify the Owners against any and all consequences arising out of the ship to ship operations including but not limited to damage to the vessel and other costs and expenses incurred as a result of such damage, including damage to or claims arising from other alongside vessels, equipment, floating cranes or barges; loss of or damage to cargo; and pollution. Vessel shall remain on-hire and bunkers consumed shall be for Charterers' account for whole duration of ship to ship operations. In event of any incident or allegation of damage to the subject vessel and/ or other ship(s) or barge(s) or property, vessel shall remain on hire for period of time relating to inspection or survey of subject vessel or vessels, repairs (temporary and permanent) and for re-inspection or re-survey post repairs.

**Clause 67**
Deleted.

**Clause 68**
Owners and Charterers to hold a joint survey on delivery or at first loading port to ascertain bunker quality remaining on board and vessel's general condition and off-hire survey at last discharging port for joint account, on-hire survey to be on Owners' time and off-hire survey to be on Charterers' time.

**Clause 69**
The holds on redelivery to be clean swept but Charterers have the option to redeliver the vessel with holds as discharged in lieu of which Charterers to pay lumpsum of U.S. $5,000 directly to Owners together with hire payment and Charterers to be free from time / expenses.

**Clause 70**
Any taxes and / or dues on the vessel, due to her flag and / or Crew shall be for Owners' account.

Any taxes and dues on cargo or freight or Charter hire to be for Charterers' account, except those levied on hire in Owners' country which to be for Owners' account.

**Clause 71 Bimco Dispute Resolution Clauses**
(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced. The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of U.S. $50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract. In the case of a dispute in respect of which arbitration has been commenced under the above, the following shall apply:-

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

**Clause 72**
Gangway watchmen always to be for Owners' account, unless compulsory by local port authority to be for Charterers' account.

**Clause 73**
Charterers have the privilege of flying their own house-flag and painting the vessel's sides and funnel with their own markings. Before termination of Charter the vessel's hull and funnel shall be repainted. Cost and time of painting and repainting to be for Charterers' account.

**Clause 74 – Asian Gypsy Moth Clause**
When the Charterers direct the vessel to any port or area infested or in any manner affected by Asian Gypsy Moth ("AGM"), including but not limited to any port of Japan, Korea and North China, Charterers shall, at Charterers' time and expense, undertake to arrange for the appropriate certificate to be issued by the appropriate authority (or private entity which can provide the relevant AGM certification) for such area/ port certifying that the vessel is free from infestation by AGM or its eggs, and place the same onboard the vessel before her departure from the affected or infested load port, strictly at Charterers' time and expense. Charterers accept that Owners shall not be held responsible and shall indemnify and hold Owners harmless in respect of any and all consequences, delays, claims or liabilities whatsoever and howsoever arising, whether at the affected or infested load port or at the next destined ports, including the ports of the USA, Australia, New Zealand and Canada.

**Clause 75**
The Charterers shall have the liberty to order the laying-up of the vessel at a safe port, berth or anchorage or any period of this Charter.

If so requested by the Charterers, the Owners will estimate savings taking into account reductions in insurance and mooring costs as well as extra costs for decommissioning and re-commissioning. If the vessel is laid up, the Charter hire shall be reduced by the estimated savings as given by the Owners prior to lay-up for such laying-up period.

**Clause 76**
Charterers undertake to keep Owners well informed during the Charter period as regards the itinerary of the vessel and names of their Agents at port of call.

**Clause 77**
Owners to guarantee that the vessel has not traded to / from any C.I.S / ex U.S.S.R. Pacific ports.

Furthermore, Owners to guarantee that the vessel on delivery meets all Agricultural Canada Plant Protection Division and U.S.D.A. Plant Protection and Quarantine Office Regulations concerning the Asian Gypsy Moth. Furthermore Owners guarantee that the vessel is free of any Asian Gypsy Moth eggs or larvae or any form of Asian Gypsy Moth life. Should the vessel be found to have same, vessel to be considered off-hire until the vessel has been passed/cleared by Canadian / U.S. authorities. All costs, consequences, losses, damages including but not limited to lose of sale / purchase to be for Owners' account.

**Clause 78**
Owners confirm that the vessel equipped Inmarsat Communication System (B) & (C) number.

Vessel also equipped GMDSS System

**Clause 79**
Owners confirm vessel is fully fitted for trading AUSTRALIA / NEW ZEALAND.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

**Clause 80 Extension of Cancelling**
If prior to delivery the Owners give notice to the Charterers that the vessel cannot be ready for delivery by the cancelling date, the Charterers, if required, shall declare within 48 running hours after receiving notice thereof from the owners whether they cancel or will take delivery of the vessel basis the new proposed laycan by the Owners.

**Clause 81**
Owners to be responsible to carriage of illegal drugs by Owners' Crew or servants and Charterers to be responsible for carriage of illegal drugs by Charterers' servants.

**Clause 82**
All cargo claims to be settled in accordance with Interclub Agreement as amended 1996 or any later amendments.

**Clause 83**
Arbitration and General Average in London and English Law to apply.

**Clause 84**
Owners guarantee vessel is not blacklisted by Richards Bay Coal Terminal.

**Clause 85 BIMCO BULK CARRIER SAFETY CLAUSES**
(a) The Charterers shall instruct the terminal operators or their representatives to co-operate with the Master in completing the IMO ship/shore safety checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(b) In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

(c) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(d) The vessel shall be always on-hire when complying with the provisions of this clause

**Clause 86**
Charterers may supply weather routing service to the Master / vessel during any voyage under the present Charter-Party. The Master is to comply with the reporting procedure of the weather service, also to follow recommendations with regard the optimum course, but the final decision to be subject to Master which should be reasonable. Vessel performance shall be monitored by weather routing service if Charterers so require.

In case of discrepancy between the weather routing service data and Master's deck logs then independent weather routing company finding to be taken as final and binding.

In case of speed deficiency bunkers savings if any shall be off-set against time lost enroute. It is mutually agreed that for sake of safe navigation while vessel navigating near coast and/or within busy traffic area, such as Malacca Strait, China coastal waters, Sea of Japan, English Channel, etc., the vessel's speed will be affected due to varying courses and reducing speed of engine for safe navigation, in which case



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

Owners/Master will not be responsible for any time loss and/or excess of bunker consumption and same should be excluded from the voyage performance calculation. Evidence shall be taken from vessel's deck log book and log abstract.

**Clause 87**
On delivery, or latest prior of vessel arrival at first loading port under this Charter-Party, all cargo holds shall be clean swept / washed down by fresh water and dried up so as to receive intended cargoes in all respect, free of salt, loose rust scale and previous cargoes residue to the satisfaction of local, relevant Surveyors.

Should the vessel not be approved by relevant Surveyor in respect of cleanliness, full self trimming bulk-carrier and fully equipped for the loading according to SOLAS Regulations, the vessel to be placed off-hire from time of failing the inspection until the vessel pass the inspection and any expense / lost time directly incurred thereby to be for Owners' account.

**Clause 88 BIMCO STANDARD I.S.M. CLAUSE**
From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that the vessel and "the company" (as defined by the ISM code) shall comply with the requirements of the ISM code. Upon request the Owners shall provide a copy of relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of "the company" to comply with the ISM Code shall be for the Owners' account.

**Clause 89**
Deleted.

**Clause 90**
It is understood that where it is safe and customary, shore mechanical devices, like vacuvators or similar loading / discharging appliances, are allowed to be put on deck and / or hatch covers, subject to deck / hatch covers strength always at Charterers' risk / time / expenses and providing no modifications whatsoever are made to the vessel, and always subject to Master's prior approval.

**Clause 91**
Subject to the terms and conditions of Owners' insurance policies the Charterers shall have the benefit of any return insurance premium receivable by the Owners from the Underwriters by reason of the vessel being in port or at safe approved anchorage for a consecutive period not less than 30 full days.

**Clause 92**
Deleted.

**Clause 93 Clearance Water Line to Top of Hatch Coaming**
See Clause 29

**Clause 94 Fouling Clause**
If the vessel is anchored and/or berthed at or off a port for more than 25 consecutive days or otherwise becomes subject to fouling as a result of Charterers trading of the vessel,, it is Charterers' responsibility to arrange for underwater bottom cleaning by divers at their time and expenses or Owners arrange bottom cleaning during vessel's routine dry-dock required by vessel's class (normally every 2 and half years).



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

It is understood Charterers have no right to claim against the Owners for the speed deficiency and / or increased bunker consumption therefrom until vessel's dry-dock or underwater cleaning performed, after which, original description again to apply.

**Clause 95  ISPS/MTSA Clause**

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.

Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners and the Master.

Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub- Charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA/USCG & CBP MOA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or Crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 96 BIMCO U.S. Security Clause for Time Chartering**

If the vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures :



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

Notwithstanding anything else contained in this Charter-Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners.

**Clause  97 Bimco Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005**
(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.
(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

**Clause 98 Bunker Quality Control Clause**
(1) The Charterers shall supply bunkers of a quality suitable for burning in the vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this charter.

(2) during the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the vessel.

(3) The fuel samples shall be retained by the vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by DNVPS, VISWALAB or by another mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

(4)The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s).



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

---

Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

Charterers warrant that all bunkers supplied by them shall be of a quality complying with category ISO-DMB for marine diesel oil and ISO-F-RMG35 for fuel oil of ISO 8217:1996 (E) or 8217:2005. Charterers' option to bunker RMF25 in Richards Bay, however, Charterers shall well plan her bunkering in terms of quantity of bunkers in order to minimize bunker supply at Richards bay as much as possible. Also Charterers shall not claim any deterioration of her speed / consumption due to quality difference. Furthermore, Owners have a right to claim any damage and consequence resulting from the quality difference.

**Clause 99 Speed Clause**
For economic reasons Charterers have the option to order the vessel to proceed at increased or reduced speed at any time and for any period of time during this Charter Party. If such speed adjustment is not compatible with the main engine maker's recommendations, the Master is permitted not to comply with Charterers' request for speed adjustment and shall instead proceed at the speed nearest possible to the one requested and notify Charterers.

**Clause 100 Safe Bunkering Clause**
Charterers undertake not to bunker the vessel with a quantity such as would require co-mingling with old bunker. If co-mingling is unavoidable, Owners reserve their right to make a claim against Charterers for any damage to the main engines or the auxiliaries caused by incompatibility between the oil and new fuel. Owners shall also not be held responsible for any reduction in the vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

**Clause 101**
Negotiations and fixture to be kept strictly Private and Confidential.

**Clause 102**
**California Waters Main Diesel Engines, Auxiliary Diesel Engines And Auxiliary Boilers Emission Limits And Requirements Clause**
Emission limits and requirements for auxiliary diesel engines and diesel-electric engines operated on ocean-going vessels within California waters and 24 nautical miles of the California baseline have taken effect on January 1, 2007. It is Charterers' obligation and responsibility to comply with all the requirements and to supply the vessel with suitable and sufficient marine gas oil (DMA defined in table I of International Standard ISO 8217:2005) with Sulphur limit below 1.5%; or marine diesel oil (DMB) with a sulphur content at or below 0.5 percent by weight prior entry into the 'regulated California waters' before December 31, 2011 and both DMA and DMB grade fuel oils are restricted to a maximum sulphur limit of 0.1% from January 1, 2012 onward.

If any failure of Charterers to comply with the provisions of California waters accept /except emission limits and requirements / regulations, Charterers are held fully responsible for any and all non compliance fee including but not limited to all delays, extra expenses and time loss due to deviation, hire of shore-side electric power, exhaust emission controls and all consequences etc. vessel should always remain on hire.

**Clause 103 WPM - U.S. Requirements Clause**
Charterers to comply with wood packing materials (WPM) US regulations i.e. dunnage supplied to the vessel must be:



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

a) Heat treated or
b) Fumigated with methyl bromide and marked with an approved international mark certifying treatment.
c) A fumigation clearance certificate shall be provided to the Master upon delivery of dunnage for cargo securing and each piece shall be IPPC certified.

**Clause 104**
For cargoes loaded wet the quantities of water pumped out during the laden sea passage ascertained by ship's logs shall be considered as cargo and will not constitute any right by receivers to claim for shortage.

**Clause 105 Short Landing Clause**
In order to avoid cargo short landing claim from receivers at discharge ports, particularly in certain African countries, Middle East and Central American countries and etc, Owners have the right to request Charterers to arrange P&I judiciary survey (including initial and final draft survey, to make calibration of silo weighting, installations to control the weighting and monitor the whole discharging process etc) at discharge ports with costs/expenses to be equally shared between head Owners and Charterers.

**Clause 106 for Puerto Drummond loading**
The Charterers shall be at liberty to fit and with Owners/Master's prior consent, which should not be unreasonably withheld, weld any additional equipment and fittings for loading, discharging and/or securing cargo. Such work shall be done at the Charterers' expense risk and time and to the satisfaction of classification society and the Charterers shall remove such equipment and fitting at their expenses and time prior to redelivery and make any and all repairs necessary to return ship to its original or equivalent condition at Charterers' expenses and time, if so required by the Owners.

**Clause 107**
**Hamburg Rules Charter Party Clause**
Neither the Charterers nor their Agents shall permit the issue of any bill of lading, waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the owner or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

**Clause 108**
**U.S. Census Bureau Mandatory Automated Export System (AES) Clause For Time Charter Parties**

(a) if the vessel loads cargo in any us port or place, the Charterers shall comply with the current us census bureau regulations (15 cfr 30) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

(i) have in place a SCAC (Standard Carrier Alpha Code);
(ii) have in place an ICB (International Carrier Bond);
(iii) provide the Owners with a timely confirmation of (i) and (ii) above; and
(iv) submit a export ocean manifest by AES (automated export system) to the us census bureau and provide the Owners at the same time with a copy thereof.

(b) the Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). should such failure result in any delay then, notwithstanding any provision in this charter party to the contrary, the vessel shall remain on hire.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

(c) if the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) the assumption of the role of carrier by the Charterers pursuant to this clause and for the purpose of the us census bureau regulations (15 cfr 30) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**Clause 109**
**U.S. Customs Advance Notification/AMS Clause for Time Charter Parties**
(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7), shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**Clause 110**
Owners have the option to add new clauses into the c/p in order to meet the new requirements by any government or non-government organizations. However the new clauses shall be mutually agreed between Owners and Charterers. It is understood and agreed that in case the proposed new regulation is not mandatory under International regulation, it is Charterers' option to accept it or not.

**Clause 111 Iranian Bunker Clause**
Charterers hereby confirm that they are fully aware of Article 11 of EU Regulation 267/2012. and all other relevant regulations. Charterers hereby  guarantee that all and any  bunkers which they will stem for the vessel are not of Iranian or Iranian blended origin. Charterers will be responsible for any consequences, including and not limited to all costs, liabilities, fines, detentions, arrest ,expenses, loss of time , incurred if they infringe the prohibitions as per Article 11 of EU Regulation 267/2012 and any other relevant regulations.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

**Clause 112 – Sales Clause**
Owners have the option of selling this vessel at any time during the course of this Charter Party and Owners will give Charterers at least 30 days prior notice of expected time and place which will not interfere with Charterers' normal operation of the ship. All time lost and all directly related expenses including additional bunker consumed in related to such sail (such sail means deviation from vessel's normal course of Charterers') to be for Owners' account. The new owners/flag shall be approved by the Charterers, however such approval shall not to be unreasonably withheld. Such written approval shall be granted by Charterers latest within 3 working days after Owners written request has been presented to Charterers' office. Charterers to do their best for an earlier reply. The buyers undertake to perform the balance of this Charter Party at the same terms and conditions which to be stated in the sales contract. Owners will be released for any responsibility, further performance, claims, losses, damages, liability and damage of whatsoever nature and howsoever arising under this Charter Party after the date of transfer, which shall be solely for the account of the new owners.

**********************





Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

---

**BIMCO Standard War Risks Clause for Time Charters, 2004**
(Code Name: CONWARTIME 2004)
(a) For the purpose of this Clause, the words:
(i) "Owners" shall include the shipOwners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported: war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or Ownership, or against certain cargoes or Crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, Crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, Crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or Ownership, or against certain cargoes or Crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d) (i) The Owners may affect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the Crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the Crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-
(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the Crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**GENERAL CLAUSE PARAMOUNT**
This Bills of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporated the rules relating to Bills of Lading contained in the International Convention dated Brussels, 25th August, 1924 and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bills of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing in this Bills of Lading shall operate to limit or deprive the carrier of any statutory protection or exemption from, or limitation of, liability.

**THE NEW JASON CLAUSE**
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, Consignees or Owners of the goods shall contribute with the Carrier in the general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his Agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the Carrier before delivery."

The Charterers shall procure that all Bills of Lading issued under this Charter-Party shall contain the same Clause.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15ᵗʰ June 2012

---

**NEW BOTH TO BLAME COLLISION CLAUSE**
If the liability for any collision in which the vessel is involved while performing this Charter-Party falls to be determined in accordance with the laws of the United States of America, the following Clause shall apply :

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants if the Carrier in the navigation or in the management of this ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than or in addition to, the colliding ships or objects are at fault in respect to a collision or contact". And the Charterers shall procure that all Bills of Lading issued under this Charter-Party shall contain the same Clause.

**SANCTIONS CLAUSE FOR TIME CHARTER PARTIES**
(a) The Owners shall not be obliged to comply with any orders for the employment of the Vessel in any carriage, trade or on a voyage which, in the reasonable judgement of the Owners, will expose the Vessel, Owners, managers, Crew, the Vessel's insurers, or their re-insurers, to any sanction or prohibition imposed by any State, Supranational or International Governmental Organisation.

(b) If the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue alternative voyage orders within 48 hours of receipt of Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the Owners may discharge any cargo already loaded at any safe port (including the port of loading). The Vessel to remain on hire pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this Sub-clause (b) anything is done or not done, such shall not be deemed a deviation.

(c) The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the Owners of the cargo and/or the holders of Bills of Lading and/or sub-Charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub-clause (b).

(d) The Charterers shall procure that this Clause shall be incorporated into all sub-charters issued pursuant to this Charter Party.

**U.S. Trade - Unique Bill of Lading Identifier Clause**
The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CFR Part 4 Section 4.7.a) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.



Additional Clauses to M/V "Great Hope"
Charter Party dated 15th June 2012

---

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

**EU Advance Cargo Declaration Clause for Time Charter Parties**
(a) If the Vessel loads cargo in any EU port or place destined for a port or place outside the EU or loads cargo outside the EU destined for an EU port or place*, the Charterers shall comply with the current EU Advance Cargo Declaration Regulations (the Security Amendment to the Community Customs Code, Regulations 648/2005; 1875/2006; and 312/2009) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and in their own name, time and expense shall:

(i) Have in place an EORI number (Economic Operator Registration and Identification);
(ii) Provide the Owners with a timely confirmation of (i) above as appropriate; and
(iii) Submit an ENS (Entry Summary Declaration) cargo declaration electronically to the EU Member States' Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the EU Advance Cargo Declaration Regulations shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

29

